### DOMINGO CORRIGAN v. CHARLES D. FITZSIMMONS.

Decided June 22, 1908.

**School Land—Application to Purchase—Occupancy—Evidence.**

The issue being whether or not appellee was an actual settler upon school land at the time he filed his application to purchase, evidence considered, and held sufficient, although conflicting, to support the finding of the jury in his favor. However humble the habitation might be if it is the home and only home of the settler at the time he makes application to purchase, he is an "actual settler" as that term is used in the Constitution and statute, and his right to purchase will be upheld. The fact that the wife and children of the applicant did not join him in the occupancy of the land until about one year after his application to purchase was filed, will not defeat his right when it is shown that their absence was caused by sickness.

Appeal from the District Court of Nueces County. Tried below before Hon. W. B. Hopkins.

*J. C. Scott* and *S. H. Woods,* for appellant.

*D. McN. Turner,* for appellee.—Plaintiff, suing in trespass to try title to public school land, and claiming under a rejected application to purchase, as against a defendant in possession under a prior award from the Commissioner of the Land Office, has the burden of proof to establish, by a preponderance of the evidence, the fact upon which he relies to avoid the title of defendant. Davis v. McCauley, 28 Texas Civ. App., 211; McBane v. Angle, 29 Texas Civ. App., 594.

PLEASANTS, CHIEF JUSTICE.—This is an action of trespass to try title brought by the appellant against the appellee to recover sections 74 and 78 of State school lands in Nueces County. Both parties claim the land in controversy under purchase from the State. The application of appellee for purchase of the land was approved by the Commissioner of the General Land Office, and the land awarded to him, in 1898. This application was for the purchase of said sections as additional lands of half section No. 128, upon which appellee claimed to be then living, and which he at the same time made application to purchase as his home section. This award to appellee was subsequently set aside by the Commissioner upon affidavit showing that appellee was not living on half section No. 128 at the time his application to purchase was made. The appellant then made an application to purchase, which was approved, and the land awarded to him. Subsequently, upon a showing made by appellee, the ruling setting aside the first award was revoked by the Commissioner, and that award reinstated, and the award to appellant set aside.

This is the third appeal of this case. The decisions on the former

appeals are reported in 7 Texas Ct. Rep., 950; 97 Texas, 595, and 16 Texas Ct. Rep., 263.

The trial in the court below, by a jury, resulted in a verdict and judgment in favor of defendant.

The only question presented upon this appeal is whether the evidence is sufficient to sustain the finding of the jury that, at the time he made his application to purchase, the appellee was an actual settler upon half section 128.

Upon this issue appellee testified that he first went upon half section No. 128 for the purpose of making his home thereon, and buying it from the State in August or September, 1897, and that at that time he built a shack on the land; that he had his farming implements, wagon, ambulance, cooking utensils and bedding with him, and that in September of that year he broke some of the ground and planted a crop of beans. He further testified as follows:

"When I made my application to purchase , on March 28, 1898, I was living on 128. I had my shanty—house—there, and I also had my farming implements, my wagons, cooking utensils, blankets and everything. At that time I had no other home, and I was a married man. I had a wife and children at that time—I think three children—and my wife was living up here in Corpus with my mother-in-law, Mrs. Lidwell, where she had been living ever since I married her.

My purpose in going on 128 was to make me a home, which I did. . . . When I went on 128 I did not have a home—lived with my mother-in-law, and was anxious to get a home; that is, my wife lived with my mother-in-law.

"From the time I made my application to purchase, on March 28, 1898, and up to the time I made my corrected applications for additional lands, April 14, 1898, I was here in Corpus Christi. I stayed here until I finished up my business and then went back. I remained here awaiting the result of my applications to the land office. During all the month of March, 1898, and up to about April 9, 1898, until I came in to make my applications, I was on that section 128. I came in in the month of March, and made my applications on March 28th.

"When I first went on 128 I cleared up a place to live. The place I cleared was up just south of the old Joe Fitzsimmons ranch, about 500 or 600 yards, more or less, and about 200 yards, more or less, inside of the line of 128.

"The first little shack I built was south of the field, where there are two big mesquite trees.

"My present home is about east—about 700 or 800 yards from the first place; it may be a little more or a little less; I am not positive, but I judge it to be about that. I took my family out there just as quick as they were able to travel. They were always sick, some of them. If my wife was not sick my mother-in-law was sick. I made one or two trips after them, but they were never able to go. I moved them out there in April, 1899, and when they first went out they lived in the little shanty I had first built. We lived in the little shanty two or three months, I think, before I built the bigger house. I don't exactly recollect whether it was a little less than that, or more. I made my applications on March 28, 1898; and I did not build a four-story house on that

land before I came in and made my application, because I built the house according to my means at that time. I was not able to do that in 1897 and 1898. Those were very hard years. I had plenty of stock, but I could not give them away.

"From September, 1897, up to the time I moved my family out on 128, I ate, slept, had my house, and lived on 128, though I may have eaten off at different places at other ranches. I have eaten most everywhere in that country; and sometimes I slept at other places, but that was my house; that is where I had everything; and that is where I could get something to eat when I could nowhere else—by that I mean 128. That is where I had my first little shack.

"The shack I built was kind of lumber, and some wood in the sides, and most all lumber on the roof—the first little one I started when I cleared off the ground and intended to build a home and buy it from the State. It was put there in August or September, 1897. That is the time I cleared off a place to build me a home. . . . I put some lumber and some wood there. And then in 1898 I added to it, and put some more lumber to it, and fixed it up different. The structure or place I put there in 1897 was six or seven or eight feet wide, and when I got through with it it was about fifteen feet long, maybe. When I first put it there I guess it was about eight or ten feet wide and about twelve or thirteen or fourteen feet long. I think it was longer than it was wide. It was square, just like a regular jacal. The first time I built it I had it smaller. I could not tell how high the walls were, but they were high enough for me to walk in, and they were made of lumber, some curbing I had gotten out of a well, and some other lumber I had there. This lumber came from the Cruz Verde ranch. The location belonged to my nephew, little Joe Fitzsimmons. And some of it was well curbing, but it was very good, solid pine or lumber. I had no brush in the walls, which I guess were seven or eight feet high—maybe only six or six and a half—don't exactly remember how large. The planks were nailed on. These walls were not all completed in December, 1897. I fixed them in 1898—added to them, and remodeled it in 1898. I added the lumber and fixed on the same frame. As to how far I got towards completion in 1897, it was all right—was completed in 1897; it was all right to live in. In 1897 it was completed for me. The walls were all right in 1897 for me. They were not as high in 1897 as I intended them to go. I put on rafters to the top of the frame, and lumber on top, after the first time in 1897. In 1897 I don't remember how high the walls were, but they were four feet high—they were higher. Now, I tell you, I added to that house. The first boards I put there in 1897 were nailed on different. On Christmas day, 1897, I guess, these walls were seven feet high; all the walls and everything were seven feet high. No, I don't think all the walls were complete on the four sides on the last day of December, 1897. I put some more boards on after that; I believe that was in 1897. I remodeled it and built different walls; I added a piece onto it. I don't know how high I built the walls in 1897. They were the same walls, only I raised the roof and made it higher. They were five or six feet high, I guess—that was the corner posts—in 1897, after I had finished it for that year. I guess all the walls were five or six feet high. I never measured them. I had posts

at the corners of that house—mesquite posts, I think.  There was lumber on the roof—just lumber nailed on it.  There was a pole on the top, nailed upon it on each side.  The roof was nailed right along boards square up and down.  I don't know if the house was entirely closed in in 1897 on all its sides.  There may have been some boards, but I had other things up against it.  There may have been a few boards lacking to close it up."

Several witnesses for appellee corroborated his statement that he had made the improvements described by him on half section 128, and was living there prior to the date of his application for purchase.  This testimony was contradicted by witnesses for appellant, who testified that no improvements of any kind were placed on the land until a month or more after appellee made his application to purchase, and that appellee did not live on the land at the time he filed his application.

The conflict in the testimony was settled by the verdict of the jury in appellee's favor, and it can not be held that the verdict is so against the great weight and preponderance of the evidence as to be clearly wrong, and we are, therefore, not authorized to disturb it.  It is true that the structure first placed on the land by appellee could hardly be called a house, but it was his place of abode, and the only home he had.  It matters not how humble his habitation may have been if, as found by the jury, the appellee was making his home upon the land at the time he made his application, he was an "actual settler," as that term is used in the Constitution and statute, and his right to purchase must be upheld.  Borchers v. Mead, 17 Texas Civ. App., 32.

Appellee's evidence shows that he has continuously lived on the land since he first settled thereon, and that he moved his family thereon as soon as their health permitted.  We think the evidence sustains the verdict.

This conclusion requires an affirmance of the judgment of the court below, and it has been so ordered.

*Affirmed.*